REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED CASES

Nos. 1304 & 2393

September Term, 2015

---

SUGHEIL CABRERA

v.

NELSON MERCADO

---

Krauser, C.J.
Berger,
Leahy,

JJ.

---

Opinion by Leahy, J.

---

Filed: September 28, 2016

This appeal concerns a marriage gone wrong, allegations of abuse, and an infant who was taken by one parent to live in another state without the other parent's knowledge or consent. The circumstance is one that the federal Parental Kidnapping Prevention Act (the "Parental Kidnapping Statute"), 28 U.S.C. § 1738A (2012), and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Maryland Code (1984, 2012 Repl. Vol.), Family Law Article ("FL"), § 9.5-101 *et seq.*, were enacted to prevent.[1]

A.M.C.[2] was born in June 2014 to Appellant Sugheil Cabrera and Appellee Nelson Mercado—a married couple living in Rockville, Maryland. Four months later, Ms. Cabrera filed a petition for a protective order against Mr. Mercado in the District Court of Maryland. The district court issued a temporary protective order ("TPO") granting temporary custody of A.M.C. to Ms. Cabrera, with visitation to Mr. Mercado. At Ms. Cabrera's prompting, the parties asked the court to postpone the scheduled merits hearing, and meanwhile, Mr. Mercado's visits with his son continued every other day without any

---

[1] *See generally* Anne B. Goldstein, *The Tragedy of the Interstate Child: A Critical Reexamination of the Uniform Child Custody Jurisdiction Act and the Parental Kidnaping Prevention Act*, 25 U.C. Davis L. Rev. 845 (1992). These statutes sought to prevent the quasi-accepted practice of "child snatching" in which a parent unilaterally moves with their child to another jurisdiction in an attempt to obtain a favorable custody determination in that jurisdiction. Christine L. Jones, *The Parental Kidnaping Prevention Act: Is there New Hope for a (Limited) Federal Forum?*, 18 Temp. Pol. & Civ. Rts. L. Rev. 141, 147 (2008). This practice arose because "[a] given interstate custody dispute could be brought in the courts of more than one state. The states frequently ignored one another's custody decisions. Thus, custody litigants, by moving from state to state, could avoid unfavorable orders." Goldstein, *supra*, at 864.

[2] In this case, we will refer to the parties' minor child by these initials.

problems.

When Mr. Mercado and his attorney appeared at the merits hearing, they learned that Ms. Cabrera had sent her attorney to dismiss the case without explanation. Soon after, they discovered Ms. Cabrera had fled to Puerto Rico—with A.M.C.

On the very day her attorney dismissed the case in Maryland, Ms. Cabrera filed a complaint for custody in the superior court in Puerto Rico. In response, Mr. Mercado quickly filed a complaint for custody and divorce in the Circuit Court for Montgomery County. These filings unleashed a jurisdictional battle over the custody of A.M.C. between the parents, and between the states[3] in which they now reside.

Although several custody and affiliated orders have been entered in both Puerto Rico and in Montgomery County, Maryland, this appeal brought by Ms. Cabrera springs mainly from the final custody order entered in favor of Mr. Mercado in the Circuit Court for Montgomery County.[4] Central to the issues Ms. Cabrera raises on appeal is the question of jurisdiction over A.M.C. under the UCCJEA and the Parental Kidnapping Statute.

We hold that Maryland is the child's "home state" under both statutes, and that Maryland already made the initial custody determination by the time Ms. Cabrera filed her complaint in Puerto Rico. Accordingly, the circuit court did not err or abuse its discretion

---

[3] The UCCJEA defines a "state" as "a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States." FL § 9.5-101(p).

[4] Ms. Cabrera actually filed three notices of appeal, but a full recitation of the procedural history in the introduction of this opinion would constitute a Sisyphean task.

in entering an emergency temporary custody order or a final custody order in Mr. Mercado's favor.

## BACKGROUND

### A. Dismissal of Petition for Protective Order

Ms. Cabrera and Mr. Mercado[5] were married on December 12, 2013 in Rockville, Maryland. The couple resided in Clarksburg, Maryland, and both were employed at the National Institutes of Health ("NIH") in Rockville, Maryland.[6] Their only child, A.M.C., was born on June 21, 2014.

On October 25, 2014, Ms. Cabrera petitioned the District Court of Maryland in Montgomery County for a protective order—for herself and A.M.C.—against Mr. Mercado. In the petition, Ms. Cabrera claimed that she "feared for [her] safety" and that Mr. Mercado was "threatening, harassing and intimidating [her] for some time now[,] and it has become a pattern . . . ." She further alleged that Mr. Mercado had displayed a pattern of obsessive activity, that she felt "stalked and harassed," and that he had been tracking her activities. Specifically, Ms. Cabrera described two incidents that she claimed occurred on October 24 and 25, 2014:

> This morning while I as leaving the house my husband blocked my entrance[.] Also while I was putting the baby in the carseat[,] he pushed the car door attempting to hurt me when I asked him for some space while

---

[5] Ms. Cabrera is from San Juan, Puerto Rico, and took residence in Montgomery County, Maryland in December 2010. Mr. Mercado is originally from La Paz, Bolivia, but has resided in Montgomery County, Maryland, since July 1989. Mr. Mercado claims that he is a citizen of the United States and no longer a Bolivian citizen.

[6] According to a pleading filed by Mr. Mercado, Ms. Cabrera has a law degree and was employed by NIH as a contract specialist.

3

securing the baby in the car.

* * *

Last night (10/24) I arrived home at 8:30 pm and he snatched the baby away from me the minute I walked in the house. He was questioning me where was I saying "God knows what you've been doing and who you've been with[.]" He made a threat that "I would know what he had for me in due time[.]" I replied saying that I wasn't going to get intimidated by him. . . .

Ms. Cabrera complained that she was being subjected to Mr. Mercado's general pattern of controlling behavior, including that he listened to her phone calls, that his body language was intimidating, and that he had "snatche[d]" A.M.C. from her arms. She also included complaints that more reflected anger or frustration rather than fear, such as her allegations that Mr. Mercado "[d]oesn't take his fa[ir] share of responsibilities" and "refuses to help with childcare and/or housework" and that she "constantly needs to remind [Mr. Mercado] to put the money in the household account." The only allegations she presented in the petition that were in any way directed toward A.M.C.—rather than toward herself—were that Mr. Mercado "likes to snatch the baby from [her] when [she's] holding him[,]" and that he raises his voice at A.M.C. when the baby gets fussy.

The district court issued an ex parte interim protective order for the benefit of Ms. Cabrera and A.M.C. against Mr. Mercado on October 26, 2014. The order, by its terms effective only through October 28, stated that there were "reasonable grounds to believe" Mr. Mercado had committed the offenses of assault and stalking, and ordered that Mr. Mercado not abuse, threaten, harass, contact, or attempt to contact Ms. Cabrera. The order further directed Mr. Mercado vacate and stay away from the couple's Clarksburg residence,

4

and granted Ms. Cabrera temporary use and possession of the home. Mr. Mercado abided by the protective order and immediately left the house upon receiving a copy.

At the ensuing protective order hearing on October 28, 2014, Mr. Mercado and his counsel appeared along with Ms. Cabrera. The district court issued a TPO at the conclusion of the hearing. Similar to the interim protective order, the TPO recited the district court's finding that there were reasonable grounds to believe Mr. Mercado had assaulted Ms. Cabrera on October 25, 2014. The TPO ordered that Mr. Mercado not abuse, threaten to abuse, harass, or contact Ms. Cabrera, and further ordered that he stay away from Ms. Cabrera's residence and place of employment. Notably, the TPO awarded custody of A.M.C. to Ms. Cabrera *until* the final protective order hearing, which was scheduled for November 5, 2014, and allowed for a three-hour supervised visitation session on November 1, 2014.

Ms. Cabrera, Mr. Mercado, and their respective attorneys appeared for the scheduled proceeding on November 5, 2014, and requested the district court extend the term of the TPO to November 17, 2014. According to Mr. Mercado, he agreed to this postponement so that the parties could negotiate visitation with A.M.C. on their own. The amended TPO provided for six visitation sessions between November 5 and November 14, 2014.[7]

On the morning of November 17, 2014, Mr. Mercado and his counsel appeared in

---

[7] According to Mr. Mercado, between November 5 and November 17 he saw his son every other day without a supervision requirement. We note there is no allegation or suggestion in the record that any problems occurred during any of the scheduled visits.

5

court. Ms. Cabrera did not appear. Instead, Ms. Cabrera's counsel appeared and requested dismissal of the petition for protective order without explanation. The district court dismissed the case.[8]

### B. Flight to Puerto Rico

Ms. Cabrera fled to Puerto Rico with A.M.C., without Mr. Mercado's knowledge or consent, on November 15, 2014—just two days prior to the scheduled hearing that was extended at her request. The *same day* that Ms. Cabrera's petition for protective order was dismissed, on November 17, 2014, Ms. Cabrera filed a complaint for custody of A.M.C. in the Superior Court of Puerto Rico for the Judicial Region of Bayamon.[9] The complaint alleged that Mr. Mercado "exhibit[ed] a pattern of domestic violence" that made cohabitation impossible. The complaint further alleged:

> 9. That [Mr. Mercado] is a citizen of Bolivia[10] and although he holds U.S. citizenship, he has expressed his desire to move the minor out of the jurisdiction, without the consent of [Ms. Cabrera].
> 10. That [Ms. Cabrera] fears that [Mr. Mercado] will remove [A.M.C.] from our jurisdiction without her consent, impeding in this manner the efforts on the part of [Ms. Cabrera] to exercise physical and legal custody, and prolonging any legal proceedings related to the custody of the minor.

The complaint also asserted that Mr. Mercado "does not show domestic behavior appropriate for his son's upbringing, risking in this manner the physical and emotional health of the minor." And, that he "faces serious behavioral problems, behaving in a

---

[8] The Order of Dismissal of Petition for Protection bears a timestamp of 9:06 A.M.

[9] The complaint filed in Puerto Rico bears what appears to be a timestamp of 10:41 A.M.

[10] Mr. Mercado denies that he is currently a Bolivian citizen.

6

violent manner physically and psychologically preventing him from offering the ideal conditions for the minor." The complaint requested, *inter alia*, (1) a temporary custody order in favor of Ms. Cabrera until a final order was issued; (2) a temporary order forbidding the removal of A.M.C. from Puerto Rico; and (3) a final custody order in favor of Ms. Cabrera. Ms. Cabrera made no mention in the complaint she filed in Puerto Rico of the fact that she had previously filed a protective order petition in Maryland that had granted her temporary custody of A.M.C.

Mr. Mercado was personally served, in Maryland, with the Puerto Rican summons (although there is some ambiguity in the record concerning the specific documents that were served on him), but he filed no responsive pleading. He does not contest that he was served.

### C. Mr. Mercado's Emergency Motion for Custody and Return of Child

On November 21, 2014, Mr. Mercado initiated the underlying action on appeal by filing an Emergency Motion to Return Child to Maryland and Emergency Motion for Temporary Custody ("Emergency Motion"), along with a complaint for divorce, custody, and child support in the Circuit Court for Montgomery County.[11] In his complaint, Mr. Mercado "contest[ed] the jurisdiction of the Commonwealth of Puerto Rico[,]" stating that he "has never been a resident nor domiciled in nor had contacts with such jurisdiction [and that] Puerto Rico is [Ms. Cabrera]'s Territory of birth to which she has absconded with [A.M.C.]." The complaint requested that Mr. Mercado be granted, *inter alia*, (1) a limited

---

[11] Ms. Cabrera never filed an answer to Mr. Mercado's complaint.

7

divorce; (2) *pendente lite* and permanent custody of A.M.C.; and (3) various relief relating to marital property and the family residence.

In the Emergency Motion, Mr. Mercado "adamantly challenge[d Ms. Cabrera]'s claim of abuse" and stated that Mr. Mercado "has been a kind, caring spouse and good father." He asserted that Maryland was A.M.C.'s home state pursuant to the Maryland UCCJEA and that Maryland "has exclusive, continuing jurisdiction over custody of [A.M.C]." As such, he asserted in the Emergency Motion that Maryland was "the proper forum for a merits determination of custody and access," and requested that he be granted temporary legal and physical custody of A.M.C. and that A.M.C. be returned to Maryland.

Mr. Mercado stated in the Emergency Motion that he had notified Ms. Cabrera by email and regular mail of the scheduled proceeding on the motion to be held on November 24, 2014. Just prior to the hearing on November 24, 2014, Mr. Mercado supplemented the Emergency Motion with a certification and several attachments demonstrating that his counsel had sent Ms. Cabrera's counsel in Maryland and her counsel in Puerto Rico notice of the hearing along with the writ of summons, a copy of the custody and divorce complaint, and a copy of the Emergency Motion.

The circuit court held a hearing on the Emergency Motion on November 24, 2014. Mr. Mercado appeared with counsel, and neither Ms. Cabrera nor counsel appeared. Mr. Mercado testified that he had abided by the terms of the protective order and that no problems had occurred during any of the scheduled visitation sessions. He further testified that Ms. Cabrera had said that she was going to Richmond, Virginia, the weekend she actually left for Puerto Rico. He also testified that he received "paperwork" on November

8

18, 2014, stating that Ms. Cabrera had initiated a custody action in a Puerto Rico court. Mr. Mercado denied Ms. Cabrera's allegations of domestic violence. He stated that the first time he learned that his wife was in Puerto Rico was when a friend of Ms. Cabrera's called him to tell him that she had not heard from Ms. Cabrera since she traveled to Puerto Rico.

After hearing Mr. Mercado's testimony, the court stated that the allegations of domestic violence complicated what would otherwise be a relatively straightforward problem—Ms. Cabrera's disappearance with the child. But, the court also noted (from Ms. Cabrera's petition for protective order) that there did not appear to be any concerns about A.M.C.'s safety with Mr. Mercado or "anything in the[] pleadings that would rise to the level of there being an allegation of some unsafety with the child." Counsel for Mr. Mercado requested a temporary custodial order.

The circuit court judge then announced her ruling:

I'm prepared to find on the basis of what I have here, which is, admittedly, one side of the story for the most part -- although I do have some of what Ms. Cabrera told the court, at least about the circumstances of the filing that she made with the protective order, and I just said, there doesn't seem to be any allegation of concern about the way the baby was being treated by Mr. Mercado -- Ms. Cabrera obviously felt like she was being disrespected.
      Her pleadings alleged stalking and, that may be what she sensed was happening. But at least as far as the child is concerned, I don't see any allegation of bad behavior.
      . . . It does seem to me that a temporary emergency custody order is in order. Whatever else is true. The way to solve these problems is not to run to another jurisdiction. Fortunately, Puerto Rico is a place that we have some ability to reach.
      So what I'm going to do is grant that request for temporary emergency custody of the child, but also say that Ms. Cabrera is entitled to a hearing on 48 hours' notice with regards to that order.
      I'll also direct law enforcement to use all reasonable force, if

9

necessary, to return the child to his father for this temporary emergency custody purposes only.

. . . [O]bviously, if Ms. Cabrera learns of this order and voluntarily returns with A[M.C.], it's probably the best of all circumstances, and then perhaps we can deal with this in some organized, practical fashion.

And it's not really a question, I don't think, of home state jurisdiction, but I think the law is clear that even though [A.M.C.] is not yet 6 months, you know, the place where he's residing is his home state. So I'm happy to sign such an order.

On November 25, 2014, the court, "satisfied that [Mr. Mercado] made good faith attempts to provide notice of this appearance to [Ms. Cabrera]" entered an emergency temporary custody order directing: (1) that Ms. Cabrera immediately surrender A.M.C. to the temporary physical and legal custody of Mr. Mercado until further order of the court; (2) that A.M.C. not be removed from Maryland; and (3) that Ms. Cabrera is entitled to a hearing on 48 hours' notice to Mr. Mercado.

On December 27, 2014, a process server served Fernando A. Cabrera Balasquides—Ms. Cabrera's father—with the Maryland emergency temporary custody order; the writ of summons; the complaint for divorce, custody, and child support; and other documents. According to the affidavit of service, the process server served Mr. Cabrera at Ms. Cabrera's "dwelling house or usual place of abode, at Club Drive J-4 Garden Hills, Guaynabo, PR 00966 with a resident of suitable age and discretion[.]"[12] The affidavit of service describes the following incident:

Deliver to the father of the recipient, when the [process server] arrives to the home also the mother of Sugheil Cabrera have the kid in her arms and a[s] soon see the Process Server she yell[s] to his husband close the garage door and put the baby down on the floor to avoid that the [process server] see the

[12] A motion filed by Ms. Cabrera on May 8, 2015 confirms that this is her address in Puerto Rico.

10

baby, but [process server] see the baby and proceed the serve the papers to the father who tell to the [process server] that he was not the father of Sugheil, the [process server] indicated that he knows i[t']s him because have seen him in photos and also see the mother in photos. He ask to[ t]he [process server] how he enter.. the [process server] explain[s] that they can[']t hide behind the gate community control access.

### D. Further Proceedings in Puerto Rico

The Puerto Rico court held a hearing on January 15, 2015, on the default order that had been entered against Mr. Mercado. According to "Minutes" produced describing the hearing, Ms. Cabrera and her counsel appeared, and Mr. Mercado did not appear. Ms. Cabrera's counsel moved for temporary custody of A.M.C. and an order that A.M.C. not be removed from Puerto Rico, which the court granted. Ms. Cabrera also moved for a default judgment against Mr. Mercado. The final hearing was scheduled for March 25, 2015, and the Puerto Rico judgment that was eventually entered stated that Mr. Mercado was notified of the hearing at his "address of record."

### E. Motion to Decline Jurisdiction in Maryland

On March 18, 2015, Ms. Cabrera's counsel entered an appearance in the circuit court on behalf of Ms. Cabrera.[13] Ms. Cabrera's counsel also moved to vacate the emergency custody order; this motion was denied.

Two days later, on March 20, Ms. Cabrera's counsel filed a motion requesting the Maryland court to decline subject matter jurisdiction under the UCCJEA and vacate the emergency custody order. In the motion, Ms. Cabrera implicitly conceded—by not

---

[13] Ms. Cabrera retained different counsel at this stage of the proceedings than the counsel who handled her case during the Maryland protective order proceedings.

11

attempting to argue the point—that Maryland was A.M.C.'s home state, but nonetheless argued that Maryland should decline jurisdiction under the UCCJEA because (1) Maryland was an inconvenient forum and (2) Puerto Rico was a more appropriate forum to determine custody and visitation. She contended that Puerto Rico was a more appropriate forum because (1) domestic violence had occurred in Maryland and Puerto Rico could best protect Ms. Cabrera and A.M.C.; (2) A.M.C. had lived in Puerto Rico for the last four months; (3) Ms. Cabrera is the custodial parent, and the noncustodial parent is in a better position to litigate in a foreign jurisdiction; (4) it would be an financial hardship for Ms. Cabrera to litigate in Maryland; (5) no agreement existed between the parties to litigate in Maryland; (6) the evidence required to resolve the custody dispute is located in Puerto Rico; (7) Puerto Rico can decide custody and visitation more expeditiously and economically; and (8) Puerto Rico is more familiar with the facts and issues of the case.

Ms. Cabrera further observed in her motion that a Puerto Rico court had already asserted subject matter jurisdiction over the matter, insisting that

> [a]ny order entered in this Court will merely be in conflict with the orders previously issued by the Puerto Rico Court. Puerto Rico has already assumed jurisdiction over matters related to custody and visitation, it has already issued a temporary order directing that custody be awarded to [Ms. Cabrera] and that the minor child may not be removed from the jurisdiction of the Puerto Rico court, and it is scheduled to address these matters in a final adjudication on March 25, 2015. **Any order issued by a Maryland Court will be of no practical effect.**

(Emphasis added).

Finally, Ms. Cabrera argued that the November 25, 2014 emergency custody order should be vacated because (1) she disputed service and (2) the circuit court was not

12

empowered to enter the order when proceedings had already begun in another jurisdiction, as they had in this case in Puerto Rico. A hearing was set for this motion on May 15, 2015.

### F. The Puerto Rican Final Custody Order

At the March 25, 2015 hearing in the superior court in Puerto Rico, Ms. Cabrera appeared once again with her counsel, and Mr. Mercado did not appear. The court received the following documentary evidence: (1) A.M.C.'s birth certificate; (2) the TPO from the Maryland district court;[14] and (3) the divorce, custody, and child support complaint filed by Mr. Cabrera in the circuit court. Ms. Cabrera also testified, and apparently the court found her credible.

The Puerto Rico court entered judgment and issued a memorandum opinion in which the court stated that Mr. Mercado[15]

> incurred in [sic] domestic violence actions against [Ms. Cabrera], during her pregnancy as well as after the birth of the minor. Said actions consisted in pushes, hair-pulling, verbal abuse and strikes with the door of her motor vehicle, which caused physical and emotional damages to [Ms. Cabrera]. Likewise, [] Mr. Mercado incurred in physical and emotional abuse against his son, consisting in shouts, locking him in a dark room and threatening to take him down to the basement of the residence, all the above in order for [A.M.C.] to stop crying.[16]

---

[14] The Puerto Rico court observed that "[o]n said order, based on the evidence received at the hearing held that there was sufficient reasonable grounds to establish an assault by [Mr. Mercado] against [Ms. Cabrera] occurred on October 25, 2014."

[15] The record contains a "certified translation" of the original opinion written in Spanish.

[16] Notably, these findings were apparently based on allegations that starkly differ from the allegations made in Ms. Cabrera's petition for a protective order in the Maryland district court. Outside of "raising his voice . . . whenever [A.M.C.] g[o]t fussy[,]" the

13

The court described the proceedings that had occurred in Maryland courts up to that point, as well as Ms. Cabrera's flight from Maryland to Puerto Rico on November 15, 2014, and then found that Ms. Cabrera's relatives in Puerto Rico were helping support her and A.M.C. The court noted that it was not Ms. Cabrera's intention "to go back to continue living in [Maryland,]" and found that Ms. Cabrera had maintained her employment in Maryland through telecommuting.[17]

The court concluded that it "ha[d] jurisdiction over [Mr. Mercado] inasmuch as the summons was served with the complaint personally to him on November 18, 2014[,]" and that Ms. Cabrera's allegations "[we]re accepted as proven" because Mr. Mercado had not filed any responsive pleading. The court recognized that the Parental Kidnapping Statute governed the court's decision, and recited the parameters under the statute for determining jurisdiction. Notably, the court's opinion stated that the Parental Kidnapping Statute provides:

> (c) A determination on custody or on visiting rights made by a court
>
> from a state is consistent with the requirements of this section only if:
>
> (1) Said court has jurisdiction under the laws of its state;
>
> (2) It complies with one of the following conditions:

Maryland petition did not allege any actual or threatened physical violence by Mr. Mercado to the baby.

[17] The record reflects, however, that Ms. Cabrera's counsel suggested to the Maryland circuit court at least once that Ms. Cabrera would like to return to the continental United States, at least temporarily, for her work at NIH.

(A) That state:

i. **is the state of residence of the minor as of the date the procedures started**, or

ii. has been the state of residence of the minor six (6) months before the date when the procedures started . . .

(Emphasis supplied).[18]   Relying on this interpretation of the Parental Kidnapping Statute, the court then concluded that Puerto Rico had jurisdiction over the custody case:

**. . . there not being any custody decision from another state in effect at**

---

[18]   The Parental Kidnapping Statute actually reads as follows:

(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if--
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:
**(A) such State (i) is the home State of the child on the date of the commencement of the proceeding**, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State[.]

28 U.S.C § 1738A(c) (emphasis added).   Notably, the Parental Kidnapping Statute, much like the UCCJEA, defines the home state as

**the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period[.]**

28 U.S.C § 1738A(b)(4) (emphasis added).

15

**this time**, having established the present ground before to the one submitted in the state of Maryland by [Mr. Mercado], and this Court having jurisdiction over [Mr. Mercado] since it was summoned pursuant to the laws of Puerto Rico, and having evidence of having [Ms. Cabrera] been the object of domestic violence, as well as of abuse toward the minor, both by [Mr. Mercado], **and there being no doubt that this Court not only has jurisdiction to attend this case**, but that its determination shall receive the full faith and credit of other jurisdiction, pursuant to the [Parental Kidnapping Statute].

(Emphasis added).

Although the certified translation of the opinion is far from clear, the Puerto Rico court seemed to believe that it had not just temporary emergency jurisdiction—but jurisdiction to decide the entire child custody proceeding under the Parental Kidnapping Statute based on its findings that (1) Puerto Rico was the child's current residence,[19] (2) there was no prior custody decision from another state in effect at that time, (3) Ms. Cabrera alleged domestic violence, and (4) Mr. Mercado had been served in Maryland. The court proceeded to grant legal custody of A.M.C. to Ms. Cabrera and stated that "[t]he transfer of [A.M.C.] . . . out of the Puerto Rican jurisdiction, without the prior authorization of this Court, is hereby forbidden." The court apparently did not consider whether the TPO constituted a custody determination,[20] nor did it consider the definition of "home state"

---

[19] This inference is drawn from the fact that the Puerto Rico court's opinion highlights the phrase "**is the state of residence of the minor as of the date the procedures started**" in its translation of the Parental Kidnapping Statute. (Emphasis in original).

[20] Under the Parental Kidnapping Statute, a "custody determination" is defined as "a judgment, decree, or other order of a court providing for the custody of a child, and **includes permanent and temporary orders, and initial orders** and modifications[.]" 28 U.S.C. § 1738(b)(3) (emphasis added).

16

under the Parental Kidnapping Statute, relying instead on its finding that Puerto Rico was the child's current residence.

## G. The Battle Over Jurisdiction Continues in Maryland

On May 5, 2015, Ms. Cabrera filed a request for registration of the Puerto Rico order in the Circuit Court for Montgomery County. The clerk of the court entered a notice of registration of the foreign custody determination on May 7, 2015, stating that it is enforceable as of the date of registration. On May 20, 2015, Mr. Mercado timely filed a motion contesting the registration of the foreign judgment.[21]

On May 8, 2015, Ms. Cabrera also filed a motion to appear by telephone in the scheduled *pendente lite* hearing. Ms. Cabrera's motion stated:

> 6. Defendant, Sugheil Cabrera, wishes to make herself available and participate in this case. . . .
> 7. Defendant will make herself available from Puerto Rico to this Court on May 15, 2015 in the event the Court has any questions. Defendant will testify at the *pendente lite* hearing from Puerto Rico on June 1, 2015 and will give her testimony regarding her income and expenses, and access for purposes of the Court deciding *pendente lite* child support and access.
>
> * * *
>
> 9. Transmission of [Ms. Cabrera]'s testimony will be by speaker phone.
> 10. Requiring the personal appearance of Defendant would cause undue hardship by having her have to fly back from Puerto Rico, and leave behind the minor child, who is still being breast-fed by [Ms. Cabrera], in order to testify.

Ms. Cabrera then requested that she be allowed to appear by telephone in both the hearing on her motion to decline jurisdiction set for May 15, 2015, and the *pendente lite* hearing

---

[21] The record does not indicate that the circuit court ever ruled upon the motion challenging enrollment of the Puerto Rico custody order in Maryland.

17

set for June 1, 2015.

Mr. Mercado filed an opposition to the motion to appear by telephone on May 13, 2015. In the motion, he argued that Ms. Cabrera continues to defy the November 25, 2014 circuit court custody order and that Ms. Cabrera has not shown good cause for absence from the proceedings. He further argued that Ms. Cabrera must appear in person so that he has the opportunity to conduct face-to-face cross examination of her because the court's "assessment of [Ms. Cabrera]'s demeanor and credibility are critical to [] the determination of the best interests of the child in these proceedings." Mr. Mercado further observed that Ms. Cabrera's motion was untimely because it was not filed 30 days before the hearing, as Maryland Rule 2-513(c) requires.

At the May 15, 2015 hearing on the motion to decline jurisdiction, Ms. Cabrera's counsel argued that (1) Ms. Cabrera had not been properly served; (2) Mr. Mercado has chosen not to participate in the Puerto Rico proceedings; (3) there is a final judgment in Puerto Rico giving custody to Ms. Cabrera that should control; and (4) under the Parental Kidnapping Statute, Puerto Rico had jurisdiction. The court engaged Ms. Cabrera's counsel in the following exchange regarding the jurisdiction over the case:

> THE COURT: . . . I think [] the problem here is that there's a disconnect between what happened in Puerto Rico and what you're asking me to do.
>
> [MS. CABRERA'S COUNSEL]: Why is that, Your Honor?
>
> THE COURT: Well, I think the reason for that is because Puerto Rico has proceeded without much regard to whether I declined or [did] not decline[] jurisdiction. But if this Court comes to the conclusion that we do still have jurisdiction, then I'd be interested to know what happens next, since it didn't seem to matter the first time.

18

[MS. CABRERA'S COUNSEL]:   Well, that is actually the problem, Your Honor, and quite frankly the point is that if this Court --

THE COURT:   That I should just wave the white flag because they proceeded regardless?

[MS. CABRERA'S COUNSEL]:   No, Your Honor.

THE COURT:   Okay.

[MS. CABRERA'S COUNSEL]:   And I understand, yes, that you can say that, but in essence what this Court does is not going to impact what Puerto Rico does.
       Now you know, under the UCCJEA there's a provision for the courts to speak to each other.

THE COURT:   Right.

[MS. CABRERA'S COUNSEL]:   And that may be an appropriate thing to do here.

THE COURT:   I think it might.

[MS. CABRERA'S COUNSEL]:   And we certainly, I mean --

THE COURT:   Yes.

[MS. CABRERA'S COUNSEL]:   -- there'd be no reason not to have that attempt.
       **It is our position, based on the way the court evaluated it, that the court at this point in time in Puerto Rico has decided that it doesn't care what Maryland does.**   And so if Maryland were to continue with this dispute, I think that's what you're outlining here, and it will be of no real effect, and we point that out in our proceedings.

(Emphasis added).   Ms. Cabrera's counsel further argued that a UCCJEA state cannot

assert jurisdiction if another state has already asserted jurisdiction.   The colloquy on

jurisdiction continued:

THE COURT:   So this is an ex parte proceeding in a circumstance that we would say didn't provide fair notice or didn't comply with what we would

19

say the rules are.

[MS. CABRERA'S COUNSEL]: I don't know why we would say that, because he was served in person, an order of default was entered in that case --

THE COURT: Yes, right. That's fine, except for that that's not actually how we would say this would proceed. So how we would say this would, first of all what jurisdiction does the Puerto Rico court have over this gentleman? None that I can think of. So he had actual notice, that's swell, but I don't know what difference that makes as far as jurisdiction [i]s concerned.

Meanwhile, there is a basis for jurisdiction here, and **the thing that troubles me about this whole analysis that you're giving me is that it's exactly what these acts were designed to avoid, which is this kind of, and it happens unfortunately all over the world,** one would have hoped not in Puerto Rico, but so be it. **That people, countries, proceed with their own set of rules about whether a child should be returned to the place from which they were removed without consent of both parties**, which is what I think happened here**. I think your client left the, she may well have had her reasons, but part of the reason that we do this with two sides available is so that we get both sides of the story.**

(Emphasis added).

Mr. Mercado defended Maryland's jurisdiction over the custody matter, insisting that Maryland was A.M.C.'s home state and the protective order petition—not the Puerto Rico custody complaint—was the first custody proceeding in this case.

The judge reserved on the motion to decline jurisdiction until after she had an opportunity to speak to the judge of the superior court in Puerto Rico.[22] Meanwhile, in her ruling, the judge declined to rescind the November 25, 2014 emergency custody order.

At the scheduled *pendente lite* hearing before a magistrate on June 1, 2015, Ms.

---

[22] As will be discussed *infra*, the order declining to vacate the Maryland emergency custody order was entered five months later, on September 14, 2015.

Cabrera once again appeared through counsel. Ms. Cabrera's counsel stated that there was nothing that could be resolved at the *pendente lite* hearing and requested that the *pendente lite* claims be dismissed. Mr. Mercado responded that there is no provision in the UCCJEA allowing a party to not appear and instead participate by telephone. Importantly, he requested that the court issue a body attachment for Ms. Cabrera because she was in violation of the *subpoena duces tecum* that had been issued to her directing her to appear with the requested documents at the scheduled *pendente lite* hearing. Ms. Cabrera's counsel requested the subpoena be quashed.

Given the request for a body attachment, the magistrate judge referred the parties back to the circuit court judge who resumed the *pendente lite* hearing later that morning. The judge stated that she had not been able to reach the Puerto Rico judge, who was on vacation, but she hoped to be able to do so soon. As a result, the judge declined to rule on the request to dismiss the *pendente lite* relief, stating that it "is not appropriately before [the court] at this point" because she had not been able to reach the Puerto Rico judge. The judge also reserved on the motion to quash and the motion to appear by telephone, stating, again, that she did not want to rule on these issues until she was able to communicate with the judge in Puerto Rico. The judge further stated that she was inclined to grant the body attachment, but reserved on this issue as well.

The next hearing occurred on June 3, 2015, after the circuit court judge was able to speak with the judge in Puerto Rico. The judge began by summarizing her discussion:

> So I did finally speak to [the Puerto Rico court] about the status of things, just to try to get a lay of the land between courts, as the UCCJEA provides. The PKPA also provides for this.

21

I think I'd say in summary that [the Puerto Rico court's] position is that, while, well, I think the short summary would be this, that he doesn't have a pleading in front of him that would request the relief that [Mr. Mercado] here seeks. . . . I'm paraphrasing here . . . is that without a pleading in front of him detailing what occurred procedurally, and what the facts are with regard to this set of proceedings . . . . He has some information about it. He knew about the protective order.   He knew about the emergency custody order.

**But he reminded me, and I think it's worth saying here, that the order he issued has the somewhat unusual provision in it that prohibits the child's removal from Puerto Rico without further court order, which juxtaposed against Ms. Cabrera's desire to return to the United States to work, seems like a problem.**

(Emphasis added).

The judge explained to those present at the hearing, that she and the Puerto Rican judge did not come to any agreement, except to acknowledge that they had a forum non conveniens issue, even if there wasn't a subject matter jurisdiction issue.   Nevertheless, she explained why she was so uncomfortable surrendering jurisdiction:

I was direct with [the Puerto Rico court] and told him that I thought while there's probably not a whole lot to question about the emergency jurisdiction, given what was presented to the court there, that doesn't confer subject matter jurisdiction.   And this I think is the place where the dichotomy between the PKPA and the UCCJEA may be holding us up a little bit. . . .

I have no way to undo or stop the Puerto Rico proceeding.   However, . . . I have no question that we have subject matter jurisdiction.   So then what happens next is that the only way to have the conversation . . . about the forum non[]convenien[s] issue, is for there to be a presence in both jurisdictions of a request to do something, because in Puerto Rico at the moment, there's no request for anybody to do anything.   Of course if Ms. Cabrera wants to come back to the U.S. with the child, she needs the court's permission there, which is an interesting circumstance.

There was a request earlier this week . . . to the magistrate, about the issuance of a body attachment for Ms. Cabrera.   I'm inclined to do that, because I, and I need to be clear on the record why I'm inclined to do it, . . . and I desperately don't want to do it, but why I'm inclined to do it.

**I think Ms. Cabrera has manipulated the system.   I think Ms.**

22

**Cabrera has taken advantage of a process and one exactly what the Parental Kidnapping Prevention Act, the UCCJEA, and frankly the Hague convention regarding child custody, are designed to avoid, which is there's a proceeding in one state. It awarded custody to a person. That person decides it's not going so well, and so they abscond with the child. And a proceeding begins in a way that may or may not be consistent with . . . Maryland's [] view of fair notice and jurisdiction.**

(Emphasis added). The judge continued to express her concern over the events that had transpired in the case and further related her conversation with the Puerto Rican judge:

> But short summary is that Ms. Cabrera has taken the parties' son to Puerto Rico, where he has remained since she took him there. He's not a loaf of bread. He's not a sack of potatoes. He's a human being. And this was not the way to resolve this issue. This is, she had a protective order, and she thought she couldn't make the protective order be a final order under the circumstances.
>
> Then she needed to do something different with a different kind of pleading. But to ask for the protective order, get it as a temporary, get custody, abscond with the child, go to Puerto Rico, file a case, dismiss the case here, and then say Puerto Rico had jurisdiction because that's how she made it be, I think is inconsistent with notions of access to justice and fair adjudication.

\* \* \*

> The other thing is that if it's really [Ms. Cabrera]'s intention to come back to the United States, the continental United States, Maryland in particular, because she wants to come back here, and that she intends to bring the child, she's knotted herself in a web that she's going to have to get out of. And while I don't think [the Puerto Rico court] was making any specific findings, what he said was if she decides to do that and she wants to take the child with her, I would close the case and rescind our jurisdiction because she's going back to Maryland.

\* \* \*

> So I will take under advisement the body attachment because I do need to look at that, although it is at least at present my intention to issue. But more importantly, I think some effort ought to be made to try to see if there's a way for you to resolve this issue, short of what at least at present looks like is going to happen, which is that there'll be a body attachment issued

23

eventually that'll be, that can be executed in Puerto Rico. She'll be incarcerated. She'll be held until she produces the child. This is not a good way to do this. There's better ways. She has them in her hand, and she can use them. And while perhaps it will be uncomfortable to have to come back to Maryland to do this, so be it. I mean it may be uncomfortable. But it's a far better way than what's happening right now.

So the thing is that now I've spoken to the [Puerto Rico] judge and at least at the moment he's unwilling to waive Puerto Rican jurisdiction, and I am unwilling to waive Maryland jurisdiction, I don't have any question that Maryland is the child's home state by our law, and that there's nothing about the situation in Puerto Rico that would, and particularly not anything about the way in which the Puerto Rican order was obtained, that persuades me at this point that we ought to cede our jurisdiction on a forum non[]convenien[s] basis. So on we go. But I do hope something besides where we stand right now can be obtained.

## H. The Maryland Final Custody Order and Other Proceedings

Two weeks after the *pendente lite* hearing—the parties having failed to resolve the issues—the court issued a writ of body attachment for Ms. Cabrera on June 15, 2015. In the court's order accompanying the writ of body attachment, the court found that Ms. Cabrera has "willfully violated the valid orders of this court, by failing to abide by this Court's orders entered on November 25, 2014 and March 18, 2015."

Ms. Cabrera filed a motion to revise the order and writ of body attachment on June 25, 2015, asserting that the body attachment was not in the best interests of the child. Ms. Cabrera added that "there is no record of delay or contumacious conduct on the part of [Ms. Cabrera], [that] there was no indication of prejudice to [Mr. Mercado], [and that Ms. Cabrera] was not adequately served with notice of the underlying subpoena[.]" She further maintained that the UCCJEA did not require her to be present in Maryland and that, because the *pendente lite* hearing did not occur, requiring her to be present on that day would serve only to "harass, annoy and oppress her."

24

On August 3, 2015, the court entered an order denying Ms. Cabrera's motion to revise the order of body attachment. On August 19, 2015, Ms. Cabrera filed the first notice of appeal to this Court in these proceedings, appealing the order denying the motion to revise the body attachment.[23]

On September 14, 2015, the circuit court entered an order denying Ms. Cabrera's motion to decline jurisdiction and vacate the emergency temporary custody order. Ms. Cabrera appealed this order, filing her second notice of appeal on September 18, 2015.[24]

Mr. Mercado then served Ms. Cabrera's counsel with another subpoena, this one for Ms. Cabrera's appearance at the September 21, 2015 trial. Ms. Cabrera filed a motion to quash the second subpoena on September 15, 2015.

The custody merits hearing was ultimately rescheduled to November 18, 2015. Mr. Mercado appeared and produced five witnesses. Ms. Cabrera was once again represented by counsel, but did not herself appear. After evidence was presented, the court made its requisite findings on the record, all the while acknowledging the one-sided nature of the proceedings.

The court first found that Mr. Mercado was a fit parent for A.M.C.[25] The court

---

[23] Notably, this notice of appeal was not filed within 30 days of the order of body attachment, which was entered on June 25, 2015; it was filed within 30 days of the denial of the motion to revise the body attachment.

[24] The first appeal, Case No. 1304, September Term 2015, was eventually consolidated with the second appeal, Case No. 2393, September Term 2015.

[25] The court did not rule that Ms. Cabrera was an unfit parent, but the court did note that the way that Ms. Cabrera disappeared with A.M.C. "reflect[ed] poorly on Ms. Cabrera as a parent."

next found that the character and reputation in the community of both parents was fine until A.M.C. was born. The court found that Mr. Mercado's request for custody was sincere and could not address any agreement between the parties because there has been no agreement and found that it could not address willingness to share custody that day. The court also found that (1) the Mercado family was willing to include Ms. Cabrera in their family life; (2) A.M.C. would be the only child in Mr. Mercado's home, but did not know about the number of children in Ms. Cabrera's home; (3) A.M.C. was too young to have a custody preference; (4) the parents had problems communicating; (5) there was a large distance between the geographic locations of the parents; (6) Mr. Mercado earned $95,000.00 a year and that Ms. Cabrera was employed; (7) Mr. Mercado could provide a stable and appropriate home for A.M.C.; (8) A.M.C. bonded with his father before their separation "and should have the opportunity to continue to do so"; and (9) A.M.C. was still too young for there to be a disruption of his social and school life.

After announcing her findings, the judge gave her ruling:

What's most relevant here is that the child will do best if he has two parents. I don't know how to make that happen, because Ms. Cabrera is in Puerto Rico, and has the child there, and has not, as of yet, returned the child here. We are, essentially, at a standoff. This is a horrible game to play with the child's life, but I don't really know beyond making an order what I can do. **So, I will find under all the circumstances, based on the factors that I have considered, that Mr. Mercado is a fit and proper parent to have sole legal custody of A[M.C.], and primary residential custody of him.** That's the language that the Maryland courts use. I think it's also pretty much the language that the Parental Kidnapping Prevention Act, and the Uniform Child Custody Jurisdiction and Enforcement Act use.

I recognize that I just made a court order that is directly opposite to what the Puerto Rican order says, but I think in this situation where an order's been made in a way that flies in the face of jurisdictional determinations in this state that I can do nothing else.

26

On December 11, 2015, the court entered its written order, reflecting that Mr. Mercado's requests for attorney's fees and costs would be determined at a later date.[26] On January 8, 2016, Ms. Cabrera filed a "Notice of Amended Appeal," appealing the order of custody.

Ms. Cabrera presents the following questions on appeal:

1. "Did the trial court err in asserting jurisdiction over custody (and entering an order for custody) when the trial court was aware that another court had already commenced a proceeding concerning custody and the other proceeding was neither terminated nor stayed and that Appellant had not been served with process?"

2. "Did the trial court err in entering an order for custody without first attempting to communicate with another court, while aware that the other court had previously asserted jurisdiction over the same child, the same parties and the same subject matter?"

3. "Did the trial court err in declining to treat Maryland as an inconvenient forum without considering the necessary factors?"

4. "Did the trial court err in issuing an order for body attachment, finding that Appellant had willfully violated the Court's orders without a hearing, show cause order or finding of contempt?"

5. "Did the trial court err in issuing a body attachment, to enforce a subpoena against Appellant, without first determining if sufficient cause existed, and when enforcement would not have benefitted the requesting party nor furthered the interests of justice?"

**DISCUSSION**

---

[26] A divorce trial, which is not part of this appeal, was scheduled for April 15, 2016. Maryland Judiciary Case Search reports that a judgment of absolute divorce was entered on April 20, 2016, and that Mr. Mercado was awarded judgments of $1,638.00 and $37,623.74, relating to maintenance and sale of the marital home and attorney's fees and costs. The last online docket entry from this case is from April 26, 2016; thus, it appears that Ms. Cabrera did not file a notice of appeal relating to this segment of the proceedings.

# I.

## Jurisdiction Over the Custody Proceedings Under the UCCJEA
## and the Parental Kidnapping Statute

As by now apparent, this case has a tangled procedural history, with three notices of appeal filed in a six-month span. To untangle this knot, we start by deciding that we have appellate jurisdiction over the questions relating to custody. A party may appeal from an interlocutory order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]" Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 12-303(3)(x). Ms. Cabrera filed her third notice of appeal on January 8, 2016, within 30 days of the circuit court's December 11, 2015 final custody order, which granted sole legal and primary residential custody of A.M.C. to Mr. Mercado, thereby necessarily depriving Ms. Cabrera of custody. Therefore, we have appellate jurisdiction over the questions Ms. Cabrera presents concerning custody, *see* CJP § 12-303(3)(x), but as explained *infra*, we do not have appellate jurisdiction over the body attachment issues raised in her first appeal.

### a. Legal Framework

The rules of engagement for this jurisdictional conflict are contained in the Parental Kidnapping Statute and the Maryland UCCJEA.

The Parental Kidnapping Statute is a federal statute, which applies in every United States jurisdiction, including Puerto Rico. Congress enacted the Parental Kidnapping Statute in 1980 to supplement the Uniform Child Custody Jurisdiction Act ("UCCJA"), codified by at least 43 states at that time, in response to the quasi-accepted practice of

28

"child snatching" to obtain a favorable custody determination in another jurisdiction. 28 U.S.C. § 1738A; Jones, *supra*, at 147 (citations omitted); Goldstein, *supra*, at 850. Although the UCCJA was "designed to establish a hierarchy of jurisdictional rules for custody cases," state courts were not required and often declined to extend full faith and credit to existing custody determinations in other jurisdictions. *Id.* at 146; *see also* Goldstein, *supra*, at 864. The Parental Kidnapping Statute was intended to resolve this growing problem by "requir[ing] states to accord full faith and credit to custody decrees." Goldstein, *supra*, at 916. Yet, interstate conflicts continue because courts interpret the Parental Kidnapping Statute inconsistently. *Id.* at 938-39; Jones, *supra*, at 149.

> The Parental Kidnapping Statute defines a child's "home state" as follows:
>
> the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, **and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons**. Periods of temporary absence of any of such persons are counted as part of the six-month or other period

28 U.S.C. § 1738A(b)(4) (emphasis added). Therefore, under the Parental Kidnapping Statute, the home state of a child not yet six months old is that in which the child has lived since birth with a parent. The statute provides that a custody determination made consistently with its provisions by one state will receive full faith and credit by another state. 28 U.S.C. § 1738A(a). A custody determination is only made consistently with the Parental Kidnapping Statute if the following jurisdictional requirements are satisfied:

> (c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if--
> > (1) such court has jurisdiction under the law of such State; and
> > **(2) one of the following conditions is met:**

**(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;**

(B) (i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse;

(D) (i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

28 U.S.C. § 1738A(c) (emphasis added). As the excerpted text demonstrates, the child's home state is given jurisdictional preference under the Parental Kidnapping Statute.

In addition, a state that exercises jurisdiction pursuant to the Parental Kidnapping Statute retains jurisdiction so long as certain conditions are met:

(d) The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of

30

any contestant.

28 U.S.C. § 1738(d). Thus, once a state has exercised jurisdiction under the Parental Kidnapping Statute, by making a child custody or visitation determination, that state retains jurisdiction as long as it (1) retains jurisdiction under its own state laws and (2) continues to be the residence of either the child or any contestant.

The model UCCJEA is the successor to the UCCJA. *Friedetzky v. Hsia*, 223 Md. App. 723, 734 (2015). In 1997, the National Conference of Commissioners of Uniform State Laws ("NCCUSL") "promulgated the UCCJEA to revise the UCCJA in order to coincide with federal enactments[, such as the Parental Kidnapping Statute,] and to resolve the consequent thirty years of conflicting case law caused by states' various enactments of the UCCJA." *Id.* (citation omitted). In 2004, Maryland enacted its version of the UCCJEA, codified at FL § 9.5-101 *et seq.*[27] 2004 Md. Laws, ch. 502 (H.B. 400).

This Court has recognized that "[t]he UCCJEA, governing custody and visitation, . . . w[as] established to provide systematic and harmonized approaches to urgent family issues in a world in which parents and guardians, who choose to live apart, increasingly live in different states and nations." *Friedetzky*, 223 Md. App. at 726-27. The UCCJEA "'provide[s] stronger guidelines for determining which state has jurisdiction, continuing jurisdiction, and modification jurisdiction over a child custody determination[.]'" *Miller*

---

[27] Every jurisdiction in the United States—with the exception of Massachusetts and Puerto Rico—has enacted the UCCJEA. Uniform Law Commission, The National Conference of Commissioners of Uniform State Laws, Child Custody Jurisdiction and Enforcement Act, http://www.uniformlaws.org/Act.aspx?title=Child%20Custody%20Jurisdiction%20and%20Enforcement%20Act [https://perma.cc/M7HG-5MWR].

*v. Mathias*, 428 Md. 419, 452 (2012) (quoting *In re Kaela C.*, 394 Md. 432, 455 (2006)).

A chief function of the UCCJEA is to "[d]eter abductions of children[.]" UCCJEA, § 101

cmt., 9 U.L.A. Part 1A, at 657 (1997). Since its promulgation, the UCCJEA has generally

"reduced the instance of jurisdictional conflicts." Andrea Charlow, *There's No Place Like*

*Home: Temporary Absences in the UCCJEA Home State*, 28 J. Am. Acad. Matrim. L. 25,

28 (2015).

> Under Maryland's UCCJEA,
>
> (h) "Home state" means:
>> (1) the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding; and
>> (2) **in the case of a child less than 6 months of age, the state in which the child lived from birth with any of the persons mentioned, including any temporary absence.**

FL § 9.5-101(h) (emphasis added). Thus, like the Parental Kidnapping Statute, if a child

is not yet six months old, a child's home state under the UCCJEA is the state in which he

or she has lived from birth with a parent. *Id.*

Further, the UCCJEA's bases for jurisdiction are substantially similar to that of the

Parental Kidnapping Statute. The UCCJEA confers jurisdictional preference to the

child's home state under FL § 9.5-201(a):

> (a) *Grounds for jurisdiction* — Except as otherwise provided in § 9.5-204 [governing temporary emergency jurisdiction] of this subtitle, **a court of this State has jurisdiction to make an initial child custody determination only if***:
>> **(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the**

32

**proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State**;

(2) a court of another state does not have jurisdiction under item (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under § 9.5-207 or § 9.5-208 of this subtitle, and:

> (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
>
> (ii) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under item (1) or (2) of this subsection have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under § 9.5-207 or § 9.5-208 of this subtitle; or

(4) no court of any other state would have jurisdiction under the criteria specified in item (1), (2), or (3) of this subsection.

(b) *Exclusive jurisdictional basis* — **Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this State.**

(c) *Effect of physical presence* — Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.

(Emphasis added). Therefore, under the UCCJEA, the child's home state has jurisdiction unless the home state has declined jurisdiction, and this is the exclusive jurisdictional basis for a court to make a child custody determination. A court that makes an initial custody determination under FL § 9.5-201 enjoys "exclusive, continuing jurisdiction over the determination[.]" FL § 9.5-202. *See also* Charlow, *supra*, 28 J. Am. Acad. Matrim. L. 25, 28 (2015) ("Once an order has been rendered consistent with the act, the issuing state has continuing, exclusive jurisdiction until all the parties and the child have left the state or the issuing state determines that the child and the parties no longer have a significant connection with the state and substantial evidence is no longer available there." (footnote

omitted)).   As stated *supra*, under the Parental Kidnapping Statute, similarly, once a state makes a child custody determination, it retains jurisdiction so long as it retains jurisdiction pursuant to its own state law and remains the residence of the child or one of the contestants.

A state should *not* exercise jurisdiction if, at the time the proceeding commences, another state "having jurisdiction substantially in conformity" with that state's UCCJEA has already begun proceeding.   In Maryland, FL § 9.5-206(a) provides:

> Except as otherwise provided in § 9.5-204 [governing temporary emergency jurisdiction] of this subtitle, a **court of this State may not exercise its jurisdiction under this subtitle if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this title**, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this State is a more convenient forum under § 9.5-207 of this subtitle.[28]

The UCCJEA, much like the Parental Kidnapping Statute, provides for temporary emergency jurisdiction when a state is not the home state of the child.   A Maryland court has temporary emergency jurisdiction if the child is physically present in Maryland and he or she has been abandoned or it is necessary in an emergency situation to protect the child

---

[28] Similarly, the Parental Kidnapping Statute provides:

**(g)** A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination.

28 U.S.C. § 1738A(g).

because the child is subjected to or being threatened with abuse.   FL § 9.5-204.   Exercise of jurisdiction under FL § 9.5-204, however, is generally temporary and does not constitute the exclusive, continuing jurisdiction of FL §§ 9.5-201 to 202.

To summarize, under the UCCJEA, a court has jurisdiction to make an initial child custody determination if (1) it is the home state of the child or was the child's home state within six months before the commencement of the proceeding and the child is absent from the state, but still has a parent living within the state; (2) there is no home state or the home state has declined to exercise jurisdiction, *and* the child and a parent have a significant connection to the state *and* substantial evidence is available in the state; (3) all courts having jurisdiction under the first two bases have declined jurisdiction; or (4) no court would be able to exercise jurisdiction under the first three bases just mentioned.   FL § 9.5-201.   Once a state has made an initial custody determination, that state enjoys exclusive, continuing jurisdiction, unless certain events not at issue in the present case occur.   *See* FL § 9.5-202.   If a state does not enjoy exclusive, continuing jurisdiction, a state may nonetheless exercise *temporary emergency* jurisdiction if a child is physically present in the state and has been abandoned or it is necessary in an emergency situation to protect the child because he or she is being subjected to or threatened with mistreatment; by its terms, however, this jurisdiction is *temporary*.   FL § 9.5-204.   Meanwhile, a court should not exercise jurisdiction, if at the time the proceeding is commenced, a child custody proceeding has been "commenced in a court of another state having jurisdiction substantially in conformity with" Maryland's UCCJEA.   FL § 9.5-206(a).

Under the Parental Kidnapping Statute, a state has jurisdiction—and, therefore, its

35

custody determination is entitled to be enforced by another state—if it has jurisdiction under its own laws and one of the following conditions is met: (1) it is the home state of the child on the commencement of the proceedings or was the home state of the child within six months before the commencement of the proceedings and the child is absent and a custody contestant continues to live within the state; (2) there is no home state, and it is in the best interest of the child that the state assume jurisdiction because (a) the child and at least one parent have a significant connection to the state and (b) there is substantial evidence in the state to determine custody; (3) the child is physically present in the state and has been abandoned or it is necessary in an emergency to protect the child because he is subject to or threatened with mistreatment or abuse; (4) no other state has jurisdiction, or every state has declined jurisdiction, and it is in the best interest of the child that the state assume jurisdiction; or (5) the court has continuing jurisdiction because it has already made a child custody determination pursuant to the Parental Kidnapping Statute. 28 U.S.C. § 1738A(c). If a state makes a child custody or visitation determination consistent with the Parental Kidnapping Statute, it enjoys continuing jurisdiction, so long as its jurisdiction continues pursuant to its laws and the state remains the residence of either the child or one custody contestant. 28 U.S.C. § 1738A(d). Meanwhile, a state should not exercise jurisdiction "during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with" the Parental Kidnapping Statute. 28 U.S.C. § 1738A(g).

The two statutes are thus substantially in accord in demarcating the bases for a court's jurisdiction over custody matters, although one might argue that the Parental

36

Kidnapping Statute provides a broader basis for emergency jurisdiction. *Compare* FL § 9.5-104, *with* 28 U.S.C. § 1738A(c)(2)(C). *But see In re Adoption of Yvette*, 881 N.E.2d 1159, 1170 (Mass. App. Ct. 2008) (under the Parental Kidnapping Statute, "because Maryland had home state jurisdiction, not to mention a pending custody case and an outstanding custody order, emergency jurisdiction in Massachusetts was 'limited to issuing temporary orders designed to effectuate [Maryland's] exercise of jurisdiction, yet keep the child[ren] safe.'" (alteration in original) (citations omitted)). Both statutes give jurisdictional preference to the child's "home state." "When there is a conflict between the [Parental Kidnapping Statute] and state law, the [Parental Kidnapping Statute], under the Supremacy Clause, prevails." *Britton v. Meier*, 148 Md. App. 419, 426 (2002).

### b. Simultaneous Proceedings Analysis

In the first issue Ms. Cabrera raises on appeal, Ms. Cabrera does not attempt to argue that Maryland was not A.M.C.'s home state under both the UCCJEA and the Parental Kidnapping Statute.[29] Instead, she argues that the trial court did not have jurisdiction to enter the emergency temporary custody order obtained by Mr. Mercado because another jurisdiction—Puerto Rico—had commenced a proceeding that had not been stayed or terminated. Ms. Cabrera contends that Puerto Rico is substantially in conformity with Maryland because it adheres to the federal Parental Kidnapping Statute. Because the

---

[29] It is undisputed that A.M.C., who was not yet six months old at the time of the initiation of any of the custody proceedings, lived in Maryland with one or both parents for his entire life until Ms. Cabrera absconded to Puerto Rico with A.M.C. on November 15, 2014. Therefore, Maryland was A.M.C.'s home state under both the UCCJEA and the Parental Kidnapping Statute. *See* FL § 9.5-101(h); 28 U.S.C. § 1738A(b)(4).

circuit court entered the emergency temporary custody order when another proceeding was pending, Ms. Cabrera maintains that the emergency temporary custody order "should be vacated and reversed."[30]

Mr. Mercado counters that Maryland was the home state of A.M.C. under the UCCJEA and that Maryland had jurisdiction under the UCCJEA. Mr. Mercado maintains that Ms. Cabrera not only initiated the first proceeding in Maryland, when she petitioned for custody of A.M.C. under the protective order, but she also authorized counsel to appear and participate in the Montgomery County proceedings, thereby submitting to the jurisdiction of that court. Mr. Mercado points out that Ms. Cabrera conceded in the complaint she filed in Puerto Rico that she was a resident of and domiciled in Maryland and, therefore, Maryland had personal jurisdiction over her under both Maryland and Puerto Rico law.[31]

Whether the trial court correctly asserted jurisdiction is an issue of statutory interpretation that we review *de novo* to determine whether the court was legally correct.

---

[30] The briefs in this case were filed before the eventual entry of the final custody order, therefore, the parties devote numerous pages to arguing whether the September 14, 2015 order—the order from which Ms. Cabrera filed her first notice of appeal—was a final judgment or an appealable interlocutory order. We do not address these arguments here, except to observe, as stated *supra*, that we have jurisdiction to decide the questions relating to custody because Ms. Cabrera filed a timely notice of appeal from the final custody order entered on December 11, 2015. The December 11, 2015 order is indisputably an appealable interlocutory order under CJP § 12-303(3)(x).

[31] Mr. Mercado cites to P.R. Laws Ann. tit. 1, § 38 for the proposition that Maryland had personal jurisdiction over Ms. Cabrera under Puerto Rico law.

Mr. Mercado also makes a blanket assertion that *all* of Ms. Cabrera's arguments are unpreserved and waived.

*Breslin v. Powell*, 421 Md. 266, 277 (2011) (citations omitted).

The central question is which jurisdiction, Maryland or Puerto Rico, commenced a "proceeding concerning the custody of the child" first. As discussed above, FL § 9.5-206(a) provides that a court may not exercise jurisdiction when a proceeding "has been commenced in a court of another state having jurisdiction substantially in conformity with this title." The answer is key to identifying which jurisdiction maintained "exclusive, continuing jurisdiction" under the UCCJEA, FL §§ 9.5-201 to 9.5-202 and continuing jurisdiction under the Parental Kidnapping Statute, 28 U.S.C. § 1738A(d).

The UCCJEA provides several definitions relevant to the current discussion:

(d) (1) "Child custody determination" means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child.
(2) "**Child custody determination**" includes a permanent, **temporary**, initial, and modification order.
(3) "Child custody determination" does not include an order relating to child support or other monetary obligation of an individual.

(e) (1) **"Child custody proceeding" means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue.**
(2) **"Child custody proceeding" includes a proceeding** for divorce, separation, neglect, **abuse**, dependency, guardianship, paternity, termination of parental rights, **and protection from domestic violence, in which the issue may appear.**
(3) "Child custody proceeding" does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Subtitle 3 of this title.

\* \* \*

(i) "Initial determination" means the first child custody determination concerning a particular child.

FL § 9.5-101 (emphasis added). As the excerpted text demonstrates, the UCCJEA explicitly defines "child custody proceeding" to include a proceeding addressing protection from domestic violence in which custody appears.

In *Cronin v. Camilleri*, a mother brought her two children to Hawaii and filed a temporary restraining order against the father after one of the children complained that the father had sexually abused her. 101 Md. App. 699, 701 (1994). The Hawaiian court issued the temporary protective order for the benefit of the mother and children, enjoining the father from contacting, threatening, physically abusing, or telephoning the mother or the children. *Id.* at 701-02. After the father did not appear for the hearing on the final protective order, the Hawaiian court entered a three-year protective order prohibiting the father from contacting the mother or the children for three years. *Id.* at 702. The mother then filed a motion to amend the protective order to include temporary custody. *Id.*

The father thereupon filed a complaint for limited divorce, which included a request for custody of the children, in the Circuit Court for Baltimore City. *Id.* He traveled to Hawaii, served the mother with his Maryland complaint, and took the children back to Baltimore. *Id.* at 702-03.

On appeal from the Maryland circuit court proceedings, this Court held that the temporary restraining order proceeding—which dealt with custody—was a custody proceeding under the UCCJA. *Id.* at 705-06. The Court affirmed the finding of the circuit court that the Hawaii temporary restraining order "'was a proceeding that's ancillary to the UCCJA and had the welfare of the child as it implicitly relate[d] to custody as part of its subject matter[.]'" *Id.* at 705 (quoting the circuit court's opinion). The court stated

40

that "[a] 'custody proceeding' includes any proceeding in which custody is at issue." *Id.* at 706 (citation omitted).[32]

The drafters of the UCCJEA intended very broad definitions of "child custody determination" and "child custody proceeding." The prefatory note to the UCCJEA states that the model statute "includes a sweeping definition that, with the exception of adoption, includes virtually all cases that can involve custody of or visitation with a child as a "custody determination." UCCJEA, Prefatory Note, 9 U.L.A. Part 1A, at 651–52 (1997). The comment on the definition of "child custody proceeding" states that "[t]he inclusion of proceedings related to protection from domestic violence is necessary because in some States domestic violence proceedings may affect custody of and visitation with a child." UCCJEA, § 102 cmt., 9 U.L.A. Part 1A, at 659 (1997).

In this case, Ms. Cabrera petitioned the Maryland district court for a protective order for herself and A.M.C. on October 25, 2014. The TPO awarded custody of A.M.C. to Ms. Cabrera until the final protective order hearing, scheduled for November 5, 2014, and it allowed Mr. Mercado a visitation session with A.M.C. As stated in Ms. Cabrera's brief on appeal, she obtained an extension of the TPO and asked the court to reschedule the merits hearing to November 17, 2014. The revised TPO provided for six scheduled visitation sessions before the date of the final protective order merits hearing. The record contains no evidence or allegation that there were any problems with these visitations, or

---

[32] *See also Stephens v. Stephens*, 646 N.E.2d 682, 686 (Ind. Ct. App. 1995) (stating that Kentucky had jurisdiction under Indiana's enactment of UCCJA when mother had initiated domestic violence proceedings—that addressed temporary custody—several days before father filed custody petition in Indiana).

with Mr. Mercado abiding by the terms of the interim protective order or the TPO. Yet two days before the merits hearing, Ms. Cabrera absconded with A.M.C. to Puerto Rico. On November 17, 2014, the date the final protective order hearing was scheduled, Ms. Cabrera's Puerto Rico counsel filed the Puerto Rico custody complaint on her behalf.

We hold that the Maryland protective order proceeding was the first custody proceeding. It was a "proceeding at which custody [wa]s at issue." *Cronin*, 101 Md. App. at 706; *see also* FL § 9.5-101(e). Similarly, the Maryland district court's TPO was the initial custody determination. The TPO awarded custody of A.M.C. to Ms. Cabrera and allowed Mr. Mercado visitation with him. *See* FL § 9.5-101(d), (e), & (i). Therefore, Maryland had "exclusive, continuing jurisdiction" under the UCCJEA, FL § 9.5-202, and continuing jurisdiction under the Parental Kidnapping Statute, 28 U.S.C. § 1738A(d).

We determine that it was not legal error for the circuit court to enter the emergency temporary custody order where the child and his parents resided in Maryland since the child's birth (with Maryland thereby constituting the home state under both the UCCJEA and the Parental Kidnapping Statute, *see* FL § 9.5-101(h); 28 U.S.C. § 1738A(b)(4)), and a second custody proceeding was initiated in Puerto Rico after the TPO proceeding was initiated in Maryland. Contrary to Ms. Cabrera's contention, FL § 9.5-206(a), precluding Maryland's assertion of jurisdiction when a state in substantial conformity has initiated a proceeding, does not apply to the situation at hand. Rather, Maryland had exclusive, continuing jurisdiction because it was both A.M.C.'s home state and the first jurisdiction

42

to make an initial child custody determination.[33] Whether Puerto Rico is in substantial

conformity with Maryland's UCCJEA, therefore, is not at issue[34] because Maryland

---

[33] To the extent that the District Court of Maryland, the court that made the initial custody determination, was a different state court than the Circuit Court for Montgomery County, which later assumed control of jurisdiction over the matter, the NCCUSL commentary on § 202 of the UCCJEA, governing exclusive, continuing jurisdiction has the following to say:

> The use of the phrase "a court of this State" under subsection (a)(1) makes it clear that **the original decree State is the sole determinant of whether jurisdiction continues. A party seeking to modify a custody determination must obtain an order from the original decree State stating that it no longer has jurisdiction.**

UCCJEA, § 202 cmt., 9 U.L.A. Part 1A, at 674 (1997) (emphasis added). Therefore, it is of no import that the two courts were separate courts. Maryland retained exclusive, continuing jurisdiction once the initial custody determination was made. FL § 9.5-202.

[34] This Court has interpreted the term "substantial conformity" to bear on whether the substantive law of the second state is in substantial conformity with Maryland's. *See, e.g.*, *Apenyo v. Apenyo*, 202 Md. App. 401, 421-23 (2011) (declining jurisdiction in light of previously filed Ghanan custody proceeding, despite fact that Maryland was home state of child, and suggesting that Ghana was in substantial conformity with Maryland, in part because it is "a sister legatee of the English common law"); *Malik v. Malik*, 99 Md. App. 521, 536 (1994) (under UCCJA, on substantial conformity issue, remanding to determine whether Pakistani court applied "best interest of the child" standard or whether "the Pakistani court applied a rule of law or evidence or procedure so contrary to Maryland public policy as to undermine confidence in the outcome of the trial").

However, we note that some other states, in determining whether a second court's jurisdiction is in substantial conformity with that of the UCCJEA—which would then require the first court to refrain from exercising jurisdiction under their analogue to FL § 9.5-206—actually analyze whether the second state's assertion of jurisdiction was correct under the UCCJEA. *See, e.g.*, *Meyeres v. Meyeres*, 196 P.3d 604, 607-08 (Utah Ct. App. 2008) (concluding that Utah trial court was not required to accept Kansas's assertion of jurisdiction over the initial custody determination when mother had beaten father to courthouse in Kansas, but when Utah was the home state, because UCCJEA required Utah trial court to determine whether Kansas's exercise of jurisdiction was proper); *In re Burk*, 252 S.W.3d 736, 741 (Tex. Ct. App. 2008) (determining that simultaneous proceedings section of Texas's UCCJEA did not bar Texas from asserting jurisdiction over custody when Texas was the home state of child because Colorado's jurisdiction was not in

already had jurisdiction under both the UCCJEA and the Parental Kidnapping Statute.

We hold the circuit court did not err by entering the emergency temporary custody order, despite the commencement of a simultaneous custody proceeding in Puerto Rico before Mr. Mercado filed his complaint and request for the emergency order in circuit court.

### c. Inadequate Service

Ms. Cabrera next contends that the trial court inappropriately exercised jurisdiction over the proceeding because Ms. Cabrera had not been served before November 25, 2014, the date the court entered the emergency temporary custody order. Because Ms. Cabrera had not been served—and had only been contacted by email and regular mail—by that date, Ms. Cabrera contends that the emergency temporary custody order "should be vacated and reversed."

In response to Ms. Cabrera's argument concerning the failure to serve her *before* November 25, 2014, Mr. Mercado asserts that "Maryland's UCCJEA further extends the State's reach, providing that notice for exercise of jurisdiction when a person is outside this State may be given in a manner prescribed by the State for service of process." (Citing FL § 9.5-107).

An issue is moot "'when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective

---

substantial conformity with Texas's); *In re Marriage of Sareen*, 153 Cal. App. 4th 371, 376 (2007) (trial court not precluded from exercising its jurisdiction, despite a previously filed custody proceeding in India—which was valid under Indian law—when proceeding was filed within nine days after arrival in India).

remedy.'" *O'Brien & Gere Eng'rs v. City of Salisbury*, 447 Md. 394, 405 (2016) (quoting *Clark v. O'Malley*, 434 Md. 171, 192 n.11 (2013)    Ms. Cabrera's service issue is moot because the final custody order is the current governing order and would still govern even if we vacated the emergency temporary custody order, as Ms. Cabrera requests.    This court was presented with a very similar situation in *Krebs v. Krebs*, 183 Md. App. 102 (2008). In that case, the mother lived with the children in Arizona, and the father lived in Maryland. *Id.* at 105-06.   The father initiated a divorce action in the Circuit Court for Worcester County, but he was unable to serve the mother because she was avoiding service.   *Id.* at 106.   During the children's visit with the father in Maryland, the father became concerned for the safety of his children—due to the mother's instability and potential drug use—and moved in the divorce action for emergency custody of his children.   *Id.* at 106-07.   The motion did not contain a certificate of service, and the mother did not appear personally or by counsel.   *Id.*   After an ex parte hearing, the Maryland magistrate granted *pendente lite* custody of the children to the father.   *Id.* at 107.

A week later, a private process server served the mother in Arizona.   *Id.* at 107. After a conference between the Arizona court and the Maryland magistrate, the Arizona court agreed to decline jurisdiction on forum non conveniens grounds, despite Arizona's status as the home state.   *Id.* at 108.   Back in Maryland, the circuit court held a full hearing on the merits, at which the mother was represented, whereupon the circuit court granted custody to the father, with visitation to the mother.   *Id.* at 109.

On appeal, the mother argued that the circuit court violated her due process rights by holding an ex parte emergency hearing without her being served.   *Id.*   This Court held

45

that this issue was moot, explaining:

> If we assume, arguendo, that [the mother] would prevail in her contention that the court should not have issued a *pendente lite* order until she had notice and an opportunity to appear at the hearing, the only relief that this Court could grant would be to vacate the *pendente lite* order and remand the matter for a new hearing at which she would have the opportunity to be present. But, [the mother] has had a plenary hearing on the merits. Consequently, the issue is moot.

*Id.* at 109-10.

In the present case, it is true that Ms. Cabrera was not served at the time the Maryland emergency temporary custody order was entered. But Ms. Cabrera certainly was served on December 27, 2014, well before the custody hearing on the merits, which occurred on November 18, 2015. Ms. Cabrera had counsel and was represented at that hearing. The only relief Ms. Cabrera requests for this alleged error is that the emergency temporary custody order be vacated and reversed, but even if we granted her relief, it would have no consequence because a final custody order is already in place.

We will nevertheless address the merits of Ms. Cabrera's argument because an appellate court "in rare instances . . . may address the merits of a moot case if [it is] convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct." *Coburn v. Coburn*, 342 Md. 244, 250 (1996) (citing *State v. Peterson*, 315 Md. 73, 82 (1989). We determine that this is such a case.

As we already have observed, despite the intent of the UCCJEA and the Parental Kidnapping Statute, interjurisdictional battles over custody issues continue, and the question of whether service and notice are required in an emergency custody proceeding is

46

one that is surely capable of repetition.   We have the ability to review a moot issue in a situation "where a controversy that becomes non-existent at the moment of judicial review is capable of repetition but evading review."  *Comptroller of the Treasury v. Zorzit*, 221 Md. App. 274, 292 (2015) (citations omitted).   Moreover, because no Maryland case has construed FL § 9.5-107 (providing the notice requirements for out-of-state persons) we undertake to decipher the notice and service requirements applicable to circumstances such as those presented in this case under Maryland's UCCJEA.

Turning to the merits we observe that Ms. Cabrera is correct in pointing out that FL § 9.5-205 mandates that notice be given to all parties before a child custody determination may be made:

> (a) Before a child custody determination is made under this title, notice and an opportunity to be heard in accordance with the standards of § 9.5-107 of this title shall be given to all persons entitled to notice under the law of this State as in child custody proceedings between residents of this State, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child.

As stated *supra*, the UCCJEA's definition of "child custody determination" includes a temporary order.  FL § 9.5-101(d).   These notice requirements apply then, to temporary custody orders.

FL § 9.5-107 describes the notice required for out-of-state persons under Maryland's UCCJEA:

> (a) *Form.* — (1) Notice required for the exercise of jurisdiction when a person is outside this State **may** be given in a manner prescribed by the law of this State for service of process or by the law of the state in which the service is made.
> (2) **Notice shall be given in a manner reasonably calculated to give actual notice but may be by publication if other means are not effective.**

47

(Emphasis added).  We determine the plain meaning of FL § 9.5-107 directs that notice may be given by service of process, accomplished according to either the law of Maryland or the law of the jurisdiction in which the person is served, but, regardless, notice must be given in a manner reasonably calculated to provide actual notice.  *See* UCCJEA, § 108 cmt., 9 U.L.A. Part 1A, at 664 (1997) ("This section authorizes notice and proof of service to be made by any method allowed by either the State which issues the notice or the State where the notice is received.").

Maryland Rule 2-121(a), which describes how service is to be made when commencing an action:

> Service of process may be made within this State or, when authorized by the law of this State, outside of this State (1) by delivering to the person to be served a copy of the summons, complaint, and all other papers filed with it; (2) if the person to be served is an individual, by leaving a copy of the summons, complaint, and all other papers filed with it at the individual's dwelling house or usual place of abode with a resident of suitable age and discretion; or (3) by mailing to the person to be served a copy of the summons, complaint, and all other papers filed with it by certified mail requesting: "Restricted Delivery—show to whom, date, address of delivery." Service by certified mail under this Rule is complete upon delivery.  **Service outside of the State may also be made in the manner prescribed by the court or prescribed by the foreign jurisdiction if reasonably calculated to give actual notice.**

(Emphasis added).  Both Maryland and Puerto Rico generally require personal service when an action is commenced.  *Id.*; P.R. Laws Ann. Tit. 32, § 4.4(a) ("Upon a person of legal age, by delivering a copy of the summons and of the complaint to him personally or to an agent authorized by him or appointed by law to receive service of process.").

As excerpted above, however, notice "shall be given in a manner reasonably

48

calculated to give actual notice but may be by publication if other means are not effective."

FL § 9.5-107(a)(2). Maryland Rule 1-351, provides the notice requirements for emergency *ex parte* relief:

> No court shall sign any order or grant any relief in an action upon an ex parte application unless:
> (a) an ex parte application is expressly provided for or necessarily implied by these rules or other law, or
> **(b) the moving party has certified in writing that all parties who will be affected have been given notice of the time and place of presentation of the application to the court or that specified efforts commensurate with the circumstances have been made to give notice.**

(Emphasis added).

It is undisputed that Ms. Cabrera was not personally served before November 25, 2014, the date the circuit court entered the emergency temporary custody order. Ms. Cabrera was not served until December 27, 2014, the date that the process server served her father, a person of "suitable age and discretion" who resided in her abode, in Puerto Rico. *See* Md. Rule 2-121(a).

On November 24, 2014, Mr. Mercado presented the circuit court with (1) a copy of a November 20, 2014 email from Mr. Mercado's counsel to Ms. Cabrera demanding A.M.C.'s return to Maryland, along with a corresponding email delivery report; (2) a copy of a November 21, 2014 email from Mr. Mercado's counsel to Ms. Cabrera, advising her of the November 24, 2014 temporary custody proceeding; (3) a copy of a November 21, 2014 email sent by Mr. Mercado's counsel to Ms. Cabrera's Puerto Rico counsel informing him of the November 24 hearing and attaching the writ of summons, the custody and divorce complaint, and the emergency custody motion, along with a corresponding email

delivery report; and (4) a copy of a November 21, 2014 email correspondence in which Mr. Mercado's counsel sent Ms. Cabrera's protective order counsel a copy of the writ of summons, the divorce and custody complaint, the Emergency Motion, and notice of the November 24, 2014 hearing and the protective order counsel's response that she no longer represented Ms. Cabrera.[35]

In this case, Ms. Cabrera absconded to Puerto Rico without notice, and made herself unavailable to personal service. Mr. Mercado's counsel tried to provide her notice by (1) emailing Ms. Cabrera several times advising her of the November 24, 2014 temporary custody proceeding, and (2) emailing Ms. Cabrera's Puerto Rico counsel and Maryland counsel informing them of the November 24, 2014 hearing and attaching copies of the writ of summons, the custody and divorce complaint, and the emergency custody motion. Mr. Mercado tried himself to call and email Ms. Cabrera. *Before* the hearing on November 24, 2014, Mr. Mercado filed a supplement to the emergency custody motion that contained attachments of the foregoing correspondence, thereby "certify[ing] in writing that all parties who will be affected have been given notice of the time and place of presentation of the application to the court or that specified efforts commensurate with the circumstances have been made to give notice." *See* Md. Rule 1-351.

We conclude that, in this factual context, where a party has fled the jurisdiction and

---

[35] At oral argument, Mr. Mercado's counsel claimed to have called, written, and emailed Ms. Cabrera's counsel with notice of the circuit court proceedings, only to be informed that that counsel no longer represented Ms. Cabrera. Mr. Mercado's counsel then gave Ms. Cabrera's new Puerto Rico counsel notice with all pleadings that had been filed and copied Ms. Cabrera.

50

made herself unavailable, that the efforts of counsel to inform the absconded party of the emergency (and thus, temporary) proceeding complied with Maryland Rule 1-351 and the Maryland law prong of FL § 9.5-107(a)(1) because such efforts were "reasonably calculated to give actual notice[,]" thereby satisfying FL § 9.5-107(a)(2). We hold, therefore, that under the circumstances, the circuit court did not commit error by entering the emergency temporary custody order without personal service on Ms. Cabrera.

**d. The Trial Court's Entry of a Custody Order Without First Communicating with the Puerto Rico Court**

Ms. Cabrera next argues that FL § 9.5-204(d)(1)[36] requires that when a Maryland court becomes aware that a child custody proceeding has commenced in another jurisdiction, the court must immediately communicate with that jurisdiction before making a child custody determination. Ms. Cabrera maintains that the circuit court's failure to do so requires that this Court "vacate[] and reverse[]" the emergency temporary custody order. Mr. Mercado offers no specific argument to combat Ms. Cabrera's contention on this issue.

---

[36] FL § 9.5-204 provides, in pertinent part:

(a) *Grounds.* — A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

* * *

(d) *Communication with other state court.* — (1) A court of this State that has been asked to make a child custody determination under this section, on being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of a state having jurisdiction under §§ 9.5-201 through 9.5-203 of this subtitle, shall immediately communicate with the other court.
(2) A court of this State that is exercising jurisdiction in accordance with §§ 9.5-201 through 9.5-203 of this subtitle, on being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.

52

We determine that Ms. Cabrera's issue concerning the circuit court's failure to communicate with the Puerto Rico court is moot for the same reason that the failure of service issue is moot. Although the circuit court failed to communicate with the Puerto Rico court before entering the emergency temporary custody order on November 25, 2014, the circuit court had communicated with the Puerto Rico court by June 3, 2015, before the entry of the final—and governing—custody order in this case.

Although we do not believe the more nuanced circumstances surrounding the circuit court's communications with the Court in Puerto Rico demand that we bypass mootness and engage in a full analysis of Ms. Cabrera's issue on appeal, we will make a few observations. First, Ms. Cabrera's assertion that FL § 9.5-204(d)(1) applies to the situation at hand is a misreading of the statute and the status of Maryland's jurisdiction over the case. Subsection (d)(1) requires that a court *that is exercising emergency temporary custody jurisdiction* under FL § 9.5-204 immediately communicate with the court exercising jurisdiction under FL §§ 9.5-201 to 203. Even though the circuit court entered a temporary emergency custody order, at no point in these proceedings was Maryland exercising temporary jurisdiction under FL § 9.5-204. As we have previously explained, Maryland was the home state of the child and was exercising continuing jurisdiction pursuant to FL § 9.5-201-02.[37]

Second, Ms. Cabrera's counsel did not broach the idea of contacting the Puerto Rico

---

[37] In addition, FL § 9.5-204(a) requires that the child to be in the State for a court to exercise temporary jurisdiction. A.M.C. was not in Maryland at this time, so the circuit court could not have been exercising temporary emergency jurisdiction under FL § 9.5-204.

court until a hearing on May 15, 2015, whereupon the circuit court said that it would.   In

fact, the circuit court decided to reserve on Ms. Cabrera's motion to decline jurisdiction

until it could speak to the Puerto Rico court.

### e.  The Circuit Court's Refusal to Decline Jurisdiction

Ms. Cabrera contends that the circuit court failed to properly consider whether

Maryland was an inconvenient forum for a determination of the custody dispute because

the court failed to recite the requisite statutory factors that must be considered under the

UCCJEA.   She maintains that domestic abuse tops the list of statutory factors and states

that the court's failure to consider this factor was an abuse of discretion.   She claims Puerto

Rico was the more convenient jurisdiction because the noncustodial parent is in a better

position to litigate from afar than the custodial parent.   Mr. Mercado does not specifically

address this argument in his brief.

We review a court's decision whether to decline to exercise jurisdiction in favor of

a more convenient forum for abuse of discretion:

> The decision whether to relinquish the court's jurisdiction in favor of a more
> convenient one is one addressed to the sound discretion of the court.   *See
> Krebs v. Krebs*, 183 Md. App. 102, 117, 960 A.2d 637, 646 (2008)
> (reviewing a court's decision to decline jurisdiction for abuse of discretion).
> This is confirmed by the fact that the statute authorizing the making of the
> decision enumerates a number of factors that the court must consider, without
> prescribing what the decision should be.   "Before finding an abuse of
> discretion we would need to agree that, 'the decision under consideration [is]
> well removed from any center mark imagined by the reviewing court and
> beyond the fringe of what that court deems minimally acceptable.'" *In re Yve
> S.*, 373 Md. 551, 583–84, 819 A.2d 1030, 1049 (2003) (quoting *In re
> Adoption/Guardianship No. 3598*, 347 Md. 295, 312–13, 701 A.2d 110, 118–
> 19 (1997) (some internal citations omitted)).

*Miller v. Mathias*, 428 Md. 419, 454 (2012).

The Maryland UCCJEA specifies the factors a court should address in considering whether Maryland is an inconvenient forum at FL § 9.5-207:

> (a) *Action if this State is inconvenient forum.* — (1) A court of this State that has jurisdiction under this title to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum.
> (2) The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.
> (b) *Factors in determination.* — (1) Before determining whether it is an inconvenient forum, a court of this State shall consider whether it is appropriate for a court of another state to exercise jurisdiction.
> (2) For the purpose under paragraph (1) of this subsection, the court shall allow the parties to submit information and shall consider all relevant factors, including:
>> (i) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;
>> (ii) the length of time the child has resided outside this State;
>> (iii) the distance between the court in this State and the court in the state that would assume jurisdiction;
>> (iv) the relative financial circumstances of the parties;
>> (v) any agreement of the parties as to which state should assume jurisdiction;
>> (vi) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;
>> (vii) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and
>> (viii) the familiarity of the court of each state with the facts and issues in the pending litigation.
> (c) *Stay of proceeding.* — If a court of this State determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper.

Ms. Cabrera's argument assumes that the circuit court did not consider these factors because the judge did not state all of her reasons for her decision not to decline jurisdiction

55

on the record at the time the decision was entered. However, FL § 9.5-207 only requires that the court consider these factors, and we decline to graft onto the statute a requirement that the judge must state a finding as to each factor onto the record.

In the present case, Ms. Cabrera filed her motion to decline jurisdiction under the UCCJEA on March 20, 2015. The parties filed pleadings with the court detailing their positions on the above-recited factors, and providing the court with information such as the relative financial circumstances of the parties. The court then held a hearing on May 15, 2015, part of which concerned Ms. Cabrera's motion, and the judge reserved on the matter until she could have a conversation with the Puerto Rico court. Before the next hearing, on June 3, 2015, the court had been in contact with the judge in Puerto Rico by phone. At the hearing the judge recited at length her reasons for her conclusion that "I don't have any question that Maryland is the child's home state by our law, and that there's nothing about the situation in Puerto Rico that would, and particularly not anything about the way in which the Puerto Rican order was obtained, that persuades me at this point that we ought to cede our jurisdiction on a forum non[] connvenien[s] basis." The court took the matter under advisement, however, until September 14, 2015 when it finally entered the order denying Ms. Cabrera's motion to decline jurisdiction. The record is clear that the circuit court judge in this case considered—indeed struggled with—the circumstances presented in this case from the time of the emergency temporary custody hearing on November 24, 2014 to the entry of the order denying the request to decline jurisdiction, almost a year later. The transcripts of the various proceedings, described and excerpted *supra*, demonstrate that the judge considered the requisite factors under FL § 9.5-207. We

56

discern no abuse of discretion in the court's denial of Ms. Cabrera's motion to decline jurisdiction for forum nonconveniens.

## II.

### Body Attachment

At the threshold of Ms. Cabrera's issues concerning the body attachment order entered on June 15, 2015, lies Mr. Mercado's contention that the order denying the motion to revise the body attachment order is not an appealable order and that, therefore, this Court has no jurisdiction to address these issues. Mr. Mercado also contends that an order of body attachment is not final and appealable until served.

Ms. Cabrera presses that the interlocutory order is appealable: (1) as a final judgment; (2) as an order for contempt, pursuant to CJP § 12-304; (3) as an appealable interlocutory order as a custody decision under CJP § 12-303(3)(x), and; (4) that an order for body attachment is appealable under the collateral order doctrine. She also argues that Maryland Rule 2-534 tolled the time for her to file her notice of appeal of the body attachment.

The body attachment order was entered by the clerk of the circuit court on June 15, 2015. On August 3, 2015, the clerk entered the court's order denying Ms. Cabrera's motion to revise the order of body attachment. On August 19, 2015, Ms. Cabrera filed her first notice of appeal, appealing the order denying the motion to revise the body attachment. Notably, this notice of appeal was filed not within 30 days of the order of body attachment, which was entered on June 15, 2015; it was only filed within 30 days of the denial of the motion to revise the body attachment.

57

Before we turn to Ms. Cabrera's professed grounds for appeal, we note that because the final order of custody is not itself a final judgment and is only appealable under CJP § 12-303(3)(x), there must be an independent basis to appeal the court's interlocutory order denying the motion to revise the body attachment.[38] *See Quillens v. Moore*, 399 Md. 97, 115 (2007) (citations omitted) ("an appeal generally must be taken from a final judgment; the decision must be 'so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding.'"). An appellate court "look[s] to whether any further order was to be issued or whether any further action was to be taken in a case to determine whether an order or ruling is a final, appealable judgment." *Nnoli v. Nnoli*, 389 Md. 315, 324 (2005) (citing *In re Samone H.*, 385 Md. 282, 297-98 (2005)). The order appealed from—the August 3, 2015 order denying Ms. Cabrera's motion to revise the body attachment—was not intended by the court "as an unqualified, final disposition of the matter in controversy," and it did not "adjudicate or complete the adjudication of all claims against all parties[.]" *See Rohrbeck*, 318 Md. at 41. The body attachment was intended to incentivize Ms. Cabrera's attendance so that the case could proceed.

---

[38] Although Maryland Rule 8-131(d) provides that "[o]n an appeal from a final judgment, an interlocutory order previously entered in the action is open to review by the Court unless an appeal has previously been taken from that order and decided on the merits by the Court[,]" no final judgment was entered in this case by the time the third notice of appeal was filed. The docket on Maryland Judiciary Case Search reflects that the parties continued to litigate their divorce in the circuit court action below, which came to a trial on April 14. A final judgment of divorce, which presumably disposed of all claims against all parties in Mr. Mercado's November 21, 2014 complaint, was entered on April 20, 2016. No appeal was taken from that judgment.

In *Nnoli v. Nnoli,* the Court of Appeals addressed the appealability of a denial of a motion to quash a body attachment that had previously been issued. 389 Md. 315, 324 (2005). We address this case first because it bears on many of the independent grounds that Ms. Cabrera asserts as grounds for the appealability of the interlocutory order denying the motion to revise the body attachment.

In *Nnoli*, the Court first noted that the petitioner was not appealing from an order holding him in contempt, but was appealing from a denial of a motion to quash a body attachment. *Id.* at 323. The court defined a "body attachment" as an "order[] directing law enforcement to take a person into custody and bring the person before the court." *Id.* at 323 n.1 (citing *Wilson v. State*, 345 Md. 437, 450 (1997)). The Court held that such an order was not appealable because it was not a final judgment, was not permitted under Maryland Rule 2-602, CJP § 12-303, or the collateral order doctrine. *Id.* Thus, there is a case that is directly on point holding that an order very similar to the order in the case *sub judice* is not immediately appealable.

Even setting the *Nnoli* decision aside, we can find no legal basis to support Ms. Cabrera's putative grounds for the appealability of the order denying the motion to revise the body attachment. Ms. Cabrera improperly invokes Rule 2-534.[39] Because that Rule

---

[39] Maryland Rule 2-534 provides:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a

applies only after a final judgment disposing of all the issues is rendered, it is inapplicable in the present context. *See Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 45 (2005) (citations omitted) ("Indeed, a motion to alter or amend a judgment may not be entertained (and is generally a nullity) until entry of the subject judgment."). And, Ms. Cabrera's next argument that CJP § 12-304[40] provides an avenue for her to appeal the original body attachment order is equally unavailing. Even if we agree (and we don't) that the General Assembly intended that such an interlocutory order is immediately appealable under § 12-304 as an order of contempt, she would still need to comply with Maryland Rule 8-202's requirement that one must file a notice of appeal within 30 days of the order. *See In re Guardianship of Zealand W.*, 220 Md. App. 66, 78-79 (2014) (citations omitted) ("Even when interlocutory appeals are permitted, however, such an appeal must be filed within thirty days of the entry of the order from which the appeal is taken. If the appeal is not filed within thirty days after the entry of an appealable interlocutory order, this Court lacks jurisdiction to entertain the interlocutory appeal."); *see also Spivery-Jones v. Receivership Estate of Trans Healthcare, Inc.*, 438 Md. 330, 357-58 (2014) (Where the Court of Appeals

---

motion for new trial. A motion to alter or amend a judgment filed after the announcement or signing by the trial court of a judgment but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

[40] CJP § 12-304 states, in pertinent part:

Any person may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action.

determined that an order denying a motion to vacate a receivership was not an appealable interlocutory order).

Finally, there is no reading of CJP § 12-303(3)(x) that would allow the order denying the motion to revise the body attachment to be appealable as a custody order, and invoking the collateral order doctrine does nothing more to save Ms. Cabrera's appeal. The collateral order doctrine "'*is a very narrow exception to the general rule* that appellate review ordinarily must await the entry of a final judgment disposing of all claims against all parties.'" *Kurstin v. Bromberg Rosenthal, LLP*, 191 Md. App. 124, 144 (2010) (emphasis in *Kurstin*) (quoting *Pittsburgh Corning v. James*, 353 Md. 657, 660-61 (1999)). The collateral order doctrine has four elements:

> (1) it must conclusively determine the disputed question;
> (2) it must resolve an important issue;
> (3) it must be completely separate from the merits of the action; and
> (4) it must be effectively unreviewable on appeal from a final judgment.

*Osborn v. Bunge*, 338 Md. 396, 403 (1995) (citing *Montgomery Cnty. v. Stevens*, 337 Md. 471, 477 (1995)). In *Broadway v. State*, this Court held that an order for a body attachment, in the criminal context, was not appealable as a final order—or under the collateral order doctrine—until the body attachment was served on the person because no issue had been "conclusively determined" until service. 202 Md. App. 464, 477-78 (2011) (citations omitted) (internal quotation marks omitted). Here, Ms. Cabrera has

*never* been served with the body attachment, so it is not appealable under the collateral order doctrine.[41]

Because none of the foregoing grounds cited by Ms. Cabrera provide her an avenue to appeal the order denying her motion to revise the order of body attachment, we hold that we are without jurisdiction to address her issues concerning the circuit court's issuance of the body attachment.

> **ORDER OF CUSTODY AFFIRMED. APPEAL OF ORDER DENYING MOTION TO REVISE ORDER OF BODY ATTACHMENT DISMISSED.**
>
> **COSTS TO BE PAID BY APPELLANT.**

---

[41] The parties do not argue CJP § 12-303(2) as a basis for jurisdiction, but that statutory subsection allows an appeal from "[a]n order granting or denying a motion to quash a writ of attachment." No case has applied this section to a body attachment; the cases applying this section are appeals from writs of attachment for *property*. *See, e.g.*, *Phyllis J. Outlaw and Assocs. v. Graham*, 172 Md. App. 16 (2006).